Nos. 14-20466; 14-20499

_____

IN THE
UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

ROBERT R. GLENN,

Plaintiff-Appellant,

v.

BP P.L.C.,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Texas

Case Nos. 4:13-cv-03660; 4:10-md-02185 (Ellison, J.)

_____

**PLAINTIFF-APPELLANT'S BRIEF**

_____

Keith A. Ketterling
Mark A. Friel
Jennifer A. Wagner
STOLL STOLL BERNE LOKTING
& SHLACHTER PC
209 SW Oak Street, Suite 500
Portland, OR  97204
(503) 227-1600

## CERTIFICATE OF INTERESTED PERSONS

ROBERT R. GLENN,

Plaintiff-Appellant,

v.                                     Nos. 14-20466; 14-20499

BP P.L.C.,

Defendant-Appellee.

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

**Parties**

1. Robert R. Glenn

2. BP p.l.c.

**Counsel**

3. Stoll Stoll Berne Lokting & Shlachter PC and its attorneys (including Steve D. Larson, Keith A. Ketterling, Mark A. Friel, Jennifer A. Wagner, and Jacob S. Gill)

4. Collmer Law Group and its attorneys (including Mark W. Collmer)

i

5.  Klafter Olsen & Lesser LLP and its attorneys (including Seth R. Lesser)

6.  Sullivan & Cromwell LLP and its attorneys (including Richard C. Pepperman, II, Marc De Leeuw, Michael P. Devlin, Daryl A. Libow, and Amanda F. Davidoff)

7.  Andrews Kurth LLP and its attorneys (including Thomas W. Taylor)

STOLL STOLL BERNE LOKTING
& SHLACHTER P.C.

By: /s/ Mark A. Friel
    Keith A. Ketterling
    Mark A. Friel
    Jennifer S. Wagner

209 S.W. Oak Street, Suite 500
Portland, OR 97204
Telephone:  (503) 227-1600
Facsimile: (503) 227-6840

Of Attorneys for Plaintiff-Appellant

## REQUEST FOR ORAL ARGUMENT

The plaintiff-appellant, Robert R. Glenn, respectfully requests oral argument. This appeal presents important issues relating to a district court's decision to dismiss, on *forum non conveniens* grounds, a class action involving a United States citizen's claim for the payment of a dividend owed by a foreign company with extensive financial ties to the United States and whose shares are traded, and which were purchased by plaintiff, on a U.S. exchange. Oral discussion of the facts and the applicable precedent would benefit the court.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ................................... i

REQUEST FOR ORAL ARGUMENT .............................................. iii

TABLE OF AUTHORITIES ............................................................ vii

I.    STATEMENT OF JURISDICTION ........................................ 1

    A.    The Basis for District Court Jurisdiction ......................... 1

    B.    The Basis for Fifth Circuit Jurisdiction .......................... 1

    C.    The Timely Filing of the Notice of Appeal ..................... 2

II.   STATEMENT OF THE ISSUE ................................................ 2

III.  STATEMENT OF THE CASE .................................................. 3

IV.   STATEMENT OF FACTS ........................................................ 5

    A.    BP Lists Shares on the NYSE Pursuant to a Deposit Agreement .......................................................... 6

    B.    BP Forms Strong Economic Ties to the United States ............................................................................... 9

    C.    BP Declares, then Purports to "Cancel," the Dividend ........................................................................ 17

V.    SUMMARY OF ARGUMENT ................................................. 25

VI.   ARGUMENT ............................................................................. 26

    A.    Standard of Review ........................................................ 26

    B.    The *Forum Non Conveniens* Framework ......................... 27

C. The District Court Abused its Discretion in Basing its Dismissal Principally on its Conclusions that Plaintiff's Claims Require the Interpretation of English Law, that Plaintiff's Claims Are Weak, and that Claims Involving English Legal Issues a Court Believes Are Weak Should Be Heard in England.......................................................................... 29

  1. The district court improperly considered the merits of plaintiff's claims .............................. 31

  2. The district court gave no weight to the fact that the applicable English law in this case is well developed .......................................... 32

  3. The district court failed to take into account that plaintiff's claims are subject to a New York choice-of-law provision and that any court deciding the case will have to look at both New York and English law .......... 35

D. The District Court Abused its Discretion in Finding that the Public Interest Factors Outweighed the Substantial Deference to Plaintiff's Choice of Forum Because, in Addition to Giving Too Much Weight to the Need to Interpret English Law, It Made Unreasonable Conclusions Unsupported by the Evidence as to Court Congestion and Local Interest............................ 37

  1. There was no evidence offered on the relative congestion of the Southern District of Texas, the Southern District of New York, or English courts ................................ 38

  2. New York and the United States have an interest in the lawsuit, and it is appropriate to have a United States jury hear it ..................... 39

E.    The District Court Abused its Discretion in Finding that the Private Interest Factors Weighed, Even Slightly, in Favor of Dismissal, Because Litigating in the United States Would Not Be Inconvenient for BP ............................................. 44

    1.    Relevant documents are under the control of BP, and under the control of third parties located in the United States .................... 45

    2.    There is no evidence on the cost of bringing willing witnesses to trial, and BP's vast economic resources weigh against having the case tried abroad ............................... 47

    3.    Class actions like this one are not available in England, and a single case in the United States is much more efficient than a series of individual lawsuits clogging English courts ................................................................... 50

VII.    CONCLUSION .......................................................... 53

CERTIFICATE OF FILING AND SERVICE ................................... 54

CERTIFICATE OF COMPLIANCE WITH FED.R.APP.P. 32(a) AND FIFTH CIRCUIT RULE 32 ........................................... 56

# TABLE OF AUTHORITIES

**Cases**

*Alnwick v. European Micro Holdings, Inc.*
  29 Fed.Appx. 781 (2d Cir. 2002) ..................................................... 31

*Banco Cafetero (Panama) S.A. v. Republic of Peru*
  1995 WL 494573 (S.D.N.Y. 1995) ................................................. 43

*Boston Telecomm. Group, Inc. v. Wood*
  588 F.3d 1201 (9th Cir. 2009) ................................................. 40, 42

*Capital Currency Exchange, N.V. v. Nat'l Westminster Bank PLC*
  155 F.3d 603 (2d Cir. 1998) .............................................................. 44

*Carey v. Bayerische Hypo-Und Vereinsbank AG*
  370 F.3d 234 (2d Cir. 2004) ........................................................... 40

*City of New Orleans Employees' Retirement Sys. v. Hayward*
  508 Fed.Appx. 293 (5th Cir. 2013) ........................................... 34, 44

*Cromer Finance Ltd. v. Berger*
  158 F.Supp.2d 347 (S.D.N.Y. 2001) ............................................... 50

*DiRienzo v. Philip Servcs. Corp.*
  294 F.3d 21 (2d Cir. 2002) ........................................................passim

*Gates Learjet Corp. v. Jensen*
  743 F.2d 1325 (9th Cir. 1984) ........................................................ 39

*Gilstrap v. Radianz Ltd.*
  443 F.Supp.2d 474 (S.D.N.Y. 2006) ................................... 32, 33, 34

*Glenn v. BP P.L.C.*
  2014 WL 2765777 (S.D.Tex. 2014) ........................................passim

*Gross v. British Broadcasting Corp.*
  386 F.3d 224 (2d Cir. 2004) ....................................................passim

*Gulf Oil Corp. v. Gilbert*
  330 U.S. 501 (1947) ........................................................... 27, 44, 47

*In re Air Crash Disaster Near New Orleans*
  821 F.2d 1147 (5th Cir. 1987) ....................................................... 28

*In re BP P.L.C. Securities Litig. (Alameda County Employees' Ret. Ass'n)*
  2013 WL 6383968 (S.D.Tex. 2013) ............................................... 35

*In re BP P.L.C. Securities Litig. (Avalon Holdings, Inc.)*
  No. 4:12-cv-3715, slip op. (S.D.Tex. Sept. 30, 2014) .................... 35

*In re BP Shareholder Derivative Litig.*
  2011 WL 4345209 (S.D.Tex. 2011) ............................................... 34

*In re Chinese Manufactured Drywall Prod. Liab. Litig.*
  742 F.3d 576 (5th Cir. 2014) ......................................................... 26

*In re Ford Motor Co.*
  591 F.3d 406 (5th Cir. 2009) ......................................................... 26

*In re Lernout & Hauspie Sec. Litig.*
  208 F.Supp.2d 74 (D. Mass. 2002) ................................................ 51

*Koster v. (American) Lumbermens Mut. Casualty Co.*
  330 U.S. 518 (1947) ........................................................................ 28

*Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*
  523 U.S. 26 (1998) ......................................................................... 38

*Manu Int'l, S.A. v. Avon Products, Inc.*
  641 F.2d 62 (2d Cir. 1981) ....................................................... 31, 32

*Neuralstem, Inc. v. ReNeuron, Ltd.*
  365 Fed.Appx. 770 (9th Cir. 2010) ............................................... 46

*Pan Am. World Airways, Inc. v. Lopez*
  490 U.S. 1032 (1989) ...................................................................... 28

*Resolution Trust Corp. v. Bright*
  6 F.3d 336 (5th Cir. 1993) ............................................................. 27

*Schexnider v. McDermott Intern., Inc.*
  817 F.2d 1159 (5th Cir. 1987) ................................................. 26, 53

*Tempur-Pedic Intern., Inc. v. Go Satellite Inc.*
  758 F.Supp.2d 366 (N.D.Tex. 2010) ............................................. 46

*Wiwa v. Royal Dutch Petroleum Co.*
  226 F.3d 88 (2d Cir 2000) ........................................ 40, 45, 49, 53

## Statutes

28 U.S.C. §1291 ................................................................................... 2

28 U.S.C. §1331 ................................................................................... 1

28 U.S.C. §1367.................................................................... 1

28 U.S.C. §1407(a) ............................................................ 38

28 U.S.C. §2107................................................................. 2

**Other Authorities**

NYSE Listing Company Manual §204.12..................................... 19, 20

NYSE Listing Company Manual §703.02(b) ..................................... 20

**Rules**

Fed.R.App.P. 4..................................................................... 2

Fed.R.Civ.P. 12(b)(6) ..................................................passim

**Regulations**

SEC Rule 10b-17................................................................. 19

## I.     STATEMENT OF JURISDICTION

### A.     The Basis for District Court Jurisdiction

This appeal arises from a class action filed in the United States District Court for the Southern District of New York, *Glenn v. BP p.l.c.*, Case No. 13-cv-8376. ROA.14-20466.6-58. After filing, the case was transferred to the United States District Court for the Southern District of Texas as part of the Multi-District Litigation ("MDL") proceeding captioned *In re BP p.l.c. Securities Litig.*, No. 4:10-md-02185. ROA.14-20466.98-99. The *Glenn* case was then assigned a new case number—13-cv-3660—in the MDL proceeding.

In *Glenn*, the initial complaint against defendant BP p.l.c. ("BP") asserted jurisdiction under 28 U.S.C. §1332(d)(2), because the aggregate claims of the putative class members exceed $5 million, exclusive of interests and costs, and plaintiff is a citizen of Oregon and BP is a citizen of a foreign state. ROA.14-20466.9.

### B.     The Basis for Fifth Circuit Jurisdiction

In the MDL proceeding, BP moved to dismiss the complaint, arguing both *forum non conveniens* and that plaintiff had no colorable claim under English law. ROA.14-20466.118. In its Memorandum and Order dated June 18, 2014, the MDL court granted the motion on the basis of *forum non conveniens*, and did not address the alternate

grounds on which BP moved. ROA.14-20466.1067, 1081; ROA.14-20499.36545, 36559[1]. The MDL court then entered a final judgment. ROA.14-20466.1082; ROA.14-20499.36560. This court has jurisdiction under 28 U.S.C. §1291.

### C.    The Timely Filing of the Notice of Appeal

The MDL court entered final judgment on June 19, 2014. ROA.14-20466.1082; ROA.14-20499.36560. Plaintiff timely filed notices of appeal under both the individual case number and the MDL case number (now consolidated here) on July 18, 2014. ROA.14-20466.1083-85; ROA.14-20499.36561-63; 28 U.S.C. §2107(a); FRAP 4(a)(1)(A).

## II.    STATEMENT OF THE ISSUE

In a class action involving the claims of a United States citizen asserted in a United States federal court relating to the failure of a foreign corporation with extensive U.S.-based operations to pay a dividend on shares purchased on a U.S. stock exchange, did the district court abuse its discretion in granting BP's motion to dismiss on the grounds of *forum non conveniens*, by: (a) failing to hold BP to its

---

[1] For the remainder of this brief, references to the district court's June 18, 2014 Memorandum and Order will be to the copy in the record in Case No. 14-20466. The Memorandum and Order is also available on Westlaw. *See Glenn v. BP P.L.C.*, 2014 WL 2765777 (S.D.Tex. 2014).

burden of proof as to all relevant factors; and (b) unreasonably balancing the factors by, among other things, (i) making erroneous conclusions regarding the location of documents, the cost of transporting witnesses to trial, local interest in the dispute, the burden on a U.S. jury, and court congestion, and (ii) relying heavily on its opinion that plaintiff's claims are weak on the merits, and that claims the court believes lack merit and involve the interpretation of English law are better resolved by an English court?

## III.   STATEMENT OF THE CASE

This case asserts claims for a debt for unpaid dividends. BP lists its American Depositary Shares ("ADSs") on the New York Stock Exchange ("NYSE"). On April 27, 2010, BP announced that its board of directors had declared a quarterly dividend for the first quarter of 2010 of $0.84 per BP ADS payable on June 21, 2010, to its ADS shareholders of record as of May 7, 2010, creating a binding and irrevocable obligation on the part of BP. Just before the payment date, and well after the record date, BP announced that its board of directors had "cancelled" the previously declared first quarter dividend. BP did not pay the dividend on June 21, 2010, as it was legally obligated to do.

Plaintiff was a BP ADS shareholder as of the record date, and he did not receive the dividend payment to which he was entitled. In

April 2011, plaintiff, a citizen and resident of the United States, filed a lawsuit in the United States District Court for the District of Oregon, seeking to recover the unpaid 2010 first quarter dividend for himself and for all other BP ADS shareholders as of the record date. Consistent with his status as a creditor of BP with respect to the unpaid dividend, plaintiff asserted claims for assumpsit, money had and received, unjust enrichment, and breach of contract.

BP successfully sought the transfer of the District of Oregon case to MDL 2185. ROA.14-20499.12730-31. BP then moved to dismiss plaintiff's claims: for failure to state a claim under Fed.R.Civ.P. 12(b)(6); under the doctrine of *forum non conveniens*; and for lack of personal jurisdiction. The court granted BP's motion on personal jurisdiction grounds. After plaintiff filed his First Amended Complaint, BP moved to dismiss plaintiff's claims on the same three grounds, and the court again dismissed the claims on personal jurisdiction grounds. ROA.14-20466.1065; *Glenn*, 2014 WL 2765777, *1 (referring to history of Oregon case).

On November 22, 2013, plaintiff filed a class action complaint in the United States District Court for the Southern District of New York, again seeking to recover the unpaid 2010 first quarter dividend for himself and for all other BP ADS shareholders as of the record

date. ROA.14-20466.6-58. Consistent with his status as a creditor of BP with respect to the unpaid dividend, plaintiff again asserted claims for assumpsit, money had and received, unjust enrichment, and breach of contract. *Id.* The Southern District of New York case was transferred to the MDL court. ROA.12-20466.98-99.

BP moved to dismiss plaintiff's claims based on the doctrine of *forum non conveniens* and Fed.R.Civ.P. 12(b)(6). ROA.14-20466.118-20. On June 18, 2014, the MDL court granted BP's motion on the sole ground of *forum non conveniens*, and did not address BP's alternative argument. ROA.14-20466.1065-81; *Glenn*, 2014 WL 2765777. A final judgment was entered in the MDL court. ROA 14-20466.1082. This appeal followed.

## IV.   STATEMENT OF FACTS

This is a class action against BP on behalf of all record holders of BP ADSs as of May 7, 2010. The claims against BP are for assumpsit, money had and received, unjust enrichment, and breach of contract arising out of BP's failure to pay its shareholders a declared dividend of $.084 per ADS.

### A.     BP Lists Shares on the NYSE Pursuant to a Deposit Agreement

BP ADSs were initially issued pursuant to a Deposit Agreement dated as of February 1, 1970, among BP, its ADS shareholders, and Morgan Guaranty Trust Company of New York. ROA.14-20466.10, ¶15.[2] That agreement has been amended and superseded over the years, the current one (most recently amended in 2010) being between BP, its ADS shareholders, and JPMorgan Chase Bank, N.A. ("JPMorgan") (the "Deposit Agreement"). *Id.*; ROA.14-20466.841-847 (excerpts); ROA.14-20499.14458-531 (complete agreement and amendment).

The Deposit Agreement provides the mechanism by which BP offers its securities on an American stock exchange, thereby gaining a wider investor base through the U.S. market. Pursuant to the Deposit Agreement, BP ordinary shares are deposited with the "Depository," JPMorgan. ROA.14-20466.10, ¶17; ROA.14-20466.842. JPMorgan in turn issues American Depository Receipts (ADRs) for BP ADSs, each of which represents six BP ordinary shares on deposit with JPMorgan. ROA.14-20466.10, ¶17; ROA.14-20466.842. BP ADSs are traded on the NYSE, which is located in New York. ROA.14-20466.10, ¶18.

---

[2] All "¶_" references are to paragraphs in the complaint, ROA.14-20466.6-58.

JPMorgan, the Depository, has its principal place of business in New York. The Deposit Agreement lists JPMorgan's address as 4 New York Plaza, 13th Floor, New York, New York, 10004. ROA.14-20466.10, ¶19; ROA.14-20499.14482.

The Deposit Agreement includes a New York choice-of-law provision. ROA.14-20466.10, ¶20; ROA.14-20466.845.

The Deposit Agreement creates an ongoing business relationship between JPMorgan, the New York Depository, and BP. Among other things, the Deposit Agreement contemplates that: (a) BP will pay dividends on the deposited securities to the Depository, and that the Depository will then distribute the dividends to the ADS shareholders; (b) BP will forward notices and reports regarding shareholder meetings to the Depository, which the Depository in turn forwards to ADS shareholders; (c) BP will pay certain ongoing expenses of the Depository; (d) the Depository and BP will consult on issues such as procedures for effectuating distributions, the fixing of record dates, and the form of proxy cards; (e) the Depository will maintain records in keeping with procedures ordinarily followed by stock transfer agents located in the City of New York, the Depository will provide full electronic access to such records to BP, and the Depository will provide access to physical records during New York business hours; (f) upon

7

the request of BP, the Depository will make certain records available for inspection at an office in New York; (g) BP will deliver to the Depository copies of governing documents and amendments thereto; (h) in the event the Depository resigns or is removed, BP will use reasonable efforts to appoint a successor, which shall be a bank or trust company having an office in New York; and (i) all notices to be given to the Depository will be sent to JPMorgan's offices in New York. ROA.14-20466.11-12, ¶22; ROA.14-20499.14467, 14475, 14477, 14479, 14482.

BP in fact has engaged in substantial and ongoing contacts with the New York Depository as contemplated by the Deposit Agreement. ROA.14-20466.12, ¶23. For instance, BP operates a Scrip Dividend Program through which ADS holders may reinvest dividend payments in BP ADSs. *Id.*, ¶24; ROA.14-20466.167. The Depository administers the Scrip Dividend Program on behalf of BP for ADS holders, and the Deposit Agreement contemplates that (when approved by BP) dividends may be distributed by the Depository in the form of ADRs (representing ADSs). ROA.14-20466.12, ¶24; ROA.14-20499.14468. Prior to the initiation of the Scrip Dividend Program in 2010, BP and the Depository operated a similar program through the BP Direct Access Plan. ROA.14-20466.12, ¶24.

BP also has an ongoing business relationship with the NYSE, which is located in New York. ROA.14-20466.12, ¶25. By virtue of its listing of ADSs on the NYSE, BP is subject to NYSE rules, and has an ongoing obligation to make certain reports and to provide information to the NYSE. *Id.* Under NYSE rules, the Deposit Agreement was a required supplement to BP's basic NYSE listing agreement. *Id.*

Plaintiff Glenn and other putative class members purchased their BP ADSs through the NYSE. ROA.14-20466.12, ¶26.

Approximately 40 percent of all BP shares are held in the United States, more than any other nation. ROA.14-20466.13, ¶29; ROA.14-20466.193. In 2010, the New York Depository held approximately 28 percent of all BP shares (which in turn were owned by the putative class members through ADSs). ROA.14-20466.13, ¶30. Before the district court, BP did not dispute that "the members of [the class of ADS shareholders as of May 7, 2010] are predominantly American." ROA.14-20466.1072; *Glenn*, 2014 WL 2765777, *4.

## B.    BP Forms Strong Economic Ties to the United States

BP was incorporated as the "Anglo-Persian Oil Company, Limited" on April 14, 1909. ROA.14-20466.13, ¶31. It has gone through several name changes since then, and became "BP p.l.c." in 2001. *Id.*

In 1965 BP organized BP North American Finance Corporation ("BPNAF"), a Delaware corporation and a wholly-owned subsidiary of BP whose sole function was to serve as a vehicle through which BP and its other subsidiaries could access capital markets in the United States. ROA.14-20466.13, ¶32. BPNAF issued 20-year promissory notes in the principal amount of $55,000,000 to institutional investors in the United States. *Id.* BPNAF loaned the proceeds to BP, and BP guaranteed the obligations of BPNAF under the notes. *Id.*

On January 23, 1970, the Morgan Guaranty Trust Company of New York filed a registration statement with the SEC seeking registration of BP ADSs, and BP ADS receipts were listed on the NYSE on March 23, 1970. ROA.14-20466.13-14, ¶33.

During the 1970s, the British government and the Bank of England (collectively, the "British Government") together owned as much as 68 percent of the outstanding ordinary shares of BP, and the BP ADS receipts traded on the NYSE represented between approximately 2 percent and 8 percent of the outstanding ordinary shares of BP. ROA.14-20466.14, ¶34. However, in 1977 the British Government began a program of divesting its BP shareholdings, and by the end of 1981 the British Government owned less than 40 percent of BP's outstanding ordinary shares. *Id.*

In June 1983 BP and BPNAF registered another $500 million in guaranteed debt securities to be issued by BPNAF and guaranteed by BP. ROA.14-20466.14, ¶35.

In 1987, the British Government completed the divestiture of its remaining interest in BP comprising approximately 31.5 percent of the outstanding shares of BP. ROA.14-20466.14, ¶36.

1987 also marked an acknowledgement by BP that investors in the U.S. represented a significant portion of its capital base. ROA.14-20466.14, ¶37. In his Letter From the Chairman dated February 19, 1987, included in BP's Annual Report and Accounts for 1986, Sir Peter Walters, chairman of BP's board of directors, noted: "The number of BP shares held in the US and traded in New York grew substantially in 1986 … I firmly believe that it is right that an international company like BP should have a commensurately international capital base." *Id.* He also explained: "Our emphasis on internationalizing BP extends well beyond the purely financial sphere." *Id.*

In May 1987 BP completed its acquisition of 100 percent of the shares of the Standard Oil Company (Ohio) (BP had acquired a 25 percent interest in 1970 and a 55 percent interest in 1978). ROA.14-20466.14, ¶38. BP combined Standard Oil and BP's other North American operations under BP America Inc., a wholly-owned subsidi-

ary of BP. *Id.* By the end of 1987, BP America Inc. represented BP's largest overseas holding and the United States provided BP with more than 52 percent of its total operating profit. ROA.14-20466.15, ¶38.

In March 1988, BP and BP America Inc. registered $1.95 billion in guaranteed debt securities to be issued by BP America Inc. and guaranteed by BP. ROA.14-20466.15, ¶39.

In 1989 BP announced that it would begin paying dividends on a quarterly basis. ROA.14-20466.15, ¶40. As explained in BP's Annual Report and Accounts for 1989, the change to quarterly dividends was intended to "give greater cash flow benefits to shareholders and to encourage wider acceptability of BP equity in North America." *Id.*

In March 1991, BP and BP America Inc. registered $2.5 billion in guaranteed debt securities to be issued by BP America and guaranteed by BP. ROA.14-20466.15, ¶41.

On December 31, 1998, BP merged with Amoco Corporation (formerly Standard Oil Company (Indiana)), an Indiana corporation whose shares were listed on the NYSE. ROA.14-20466.15, ¶42; ROA.14-20499.14669. As a result of the merger Amoco Corporation became a wholly-owned subsidiary of BP America Inc. ROA.14-20466.15-16, ¶42. In connection with the merger Amoco Corporation changed its name to BP Amoco Corporation, and in 2001 BP Amoco

Corporation changed its name to BP Corporation North America Inc. ROA.14-20466.16, ¶42.

In 1999 BP also entered into an agreement to acquire Atlantic Richfield Company ("ARCO"), a Delaware corporation whose shares were listed on the NYSE. ROA.14-20466.16, ¶43. On April 18, 2000, BP completed its acquisition of ARCO. As a result of the acquisition ARCO became a wholly-owned subsidiary of BP America Inc. *Id.*

On February 15, 2002, BP organized BP Capital Markets America Inc. ("BPCMA"), a wholly-owned subsidiary of BP America Inc., whose sole function was to serve as a financing vehicle for BP and to issue debt securities on behalf of BP. ROA.14-20466.16, ¶44. On February 18, 2002, BP organized BP Canada Finance Company ("BPCFC"), a wholly-owned subsidiary of BP America Inc., whose sole function also was to serve as a financing vehicle for BP and to issue debt securities on behalf of BP. *Id.* On February 22, 2002, BP, BPCMA, BPCFC, and two other wholly-owned subsidiaries of BP filed a shelf registration statement for up to $6 billion in guaranteed debt securities to be issued by BPCMA, BPCFC, and/or the other registrants, and guaranteed by BP. *Id.*

On November 3, 2003, BP, BPCMA, BPCFC, and two other wholly-owned subsidiaries of BP filed a shelf registration statement for

up to $9.147 billion in guaranteed debt securities to be issued by BPCMA, BPCFC, and/or the other registrants, and guaranteed by BP. ROA.14-20466.16, ¶45.

At all relevant times, BP has held out and represented in its Annual Report that BP America Inc. is its agent in the U.S. ROA.14-20466.16, ¶47; ROA.14-20499.14668-689.

The U.S. operations of BP America Inc. make up the largest single geographic segment of BP's global operations. ROA.14-20466.17, ¶48. For example: (a) in 2010, the U.S. region accounted for nearly 35 percent of BP's operating revenues, more than 42 percent of BP's fixed assets, and more than 42 percent of BP's capital investments and acquisitions; (b) in 2009, the U.S. region accounted for more than 35 percent of BP's operating revenues, more than 40 percent of BP's fixed assets, and more than 48 percent of BP's capital investments and acquisitions; and (c) in 2008, the U.S. region accounted for more than 51 percent of BP's operating revenues, more than 41 percent of BP's fixed assets, and more than 52 percent of BP's capital investments and acquisitions. *Id.*; ROA.14.20499.14684, 14687. As explained in a March 2011 speech given by Lamar McKay, Executive Vice President of BP and Chairman and President of BP America Inc.: "There should be no doubt whatsoever of the im-

portance of the US for BP, for now, for the future, for the long-term future." ROA.14-20466.17, ¶48.

BP operates in the U.S. and New York through BP America Inc. and its other agents, including numerous wholly-owned subsidiaries and agents of BP America Inc., each of which is actively registered and authorized to conduct business in the state of New York. ROA.14-20466.17-19, ¶49. BP, directly and/or through its network of agents and subsidiaries, engages in its core business operations in New York and the United States. ROA.14-20466.19, ¶50.

BP operates thousands of retail gas stations throughout the U.S., including hundreds of such stations in New York. ROA.14-20466.19, ¶51. As stated in one BP report: "BP, the leading gas marketer in New York, fuels LaGuardia Airport and delivers natural gas in the southeastern part of the state." *Id.*; *see also* ROA.14-20499.14643 ("BP America … operate(s) five refineries that process nearly 1.5 million barrels a day of crude oil, and a system of pipelines and terminals throughout the United States that supply over 70 million gallons per day of gasoline and distillate fuels to customers in 35 states."). BP's U.S. operations represent over 50 percent of BP's global retail presence. ROA.14-20466.19, ¶51. BP boasts: "In the United States BP and its heritage companies have been in business for over 100 years,

and we intend to be around for the long run. We are the number one oil and gas producer in the US helping to contribute to America's energy security." ROA 14-20466.195.

Approximately 30 percent of BP's 80,000 employees are located in the U.S., more than in any other country. ROA.14-20466.19, ¶52; ROA.14-20466.193. BP and/or its subsidiaries have employees located in New York. ROA.14-20466.19, ¶52.

BP maintains New York legal counsel. ROA.14-20466.19, ¶53.

BP engages in substantial advertisement throughout the United States, including in New York, and has websites available for viewing in the United States and New York. ROA.14-20466.19, ¶54.

BP's operations in New York and the U.S. are part of an integrated global group managed from BP's executive offices in London. ROA.14-20466.19, ¶55; ROA.14-20499.14664 (May 2010 statement by Lamar McKay that "[a]s Chairman and President of BP America, Inc., I am part of an executive team that reports directly to our Global CEO, Tony Hayward. I am BP's lead representative in the US and am responsible for broad oversight and connectivity across all of our US-based businesses.").

At the end of 2010, BP had a centralized global executive management structure in which BP's Executive Vice President, Chairman

and President of BP America Inc., was "BP's chief representative in the United States." ROA.14-20466.20, ¶57.

BP guarantees the finance debt of BP America Inc. and BP's other wholly-owned subsidiaries, and presents the BP Group as a single, unitary enterprise made up of BP and its operating subsidiaries, associates, and joint ventures. ROA.14-20466.26, ¶¶63-64.

## C.    BP Declares, then Purports to "Cancel," the Dividend

On April 27, 2010, BP announced that its board of directors, as usual, had declared a quarterly dividend for the first quarter of 2010 of $0.84 per ADS payable on June 21, 2010, to its ADS shareholders of record as of May 7, 2010. ROA.14-20466.40, ¶92. The total value of the dividends owing to the record date ADS holders was approximately $750 million. ROA.14-20466.7, ¶2.

Prior to 2010, BP had paid dividends on its ordinary shares in each year since 1917, and hundreds of thousands of BP shareholders, and millions of other investors in mutual funds and pension funds, relied on the BP dividend as part of their financial security and retirement income. ROA.14-20466.40, ¶93; ROA.14-20466.190.

BP's Articles of Association authorize the directors to declare dividends. ROA.14-20466.40, ¶94. BP's directors gained that authori-

ty in 2003, when BP's shareholders approved new Articles of Association. ROA.14-20466.40-41, ¶94. Article 131 provides:

**Powers and rights in respect of dividends**

**131**   (A)   The Company may by ordinary resolution declare dividends but no such dividend shall exceed the amount recommended by the Directors

(B)   The Directors may also from time to time declare and pay dividends on shares of any class of such amounts and on such dates and in respect of such periods as they think fit

(C)   Dividends may be declared and paid in any currency or currencies that the Directors shall determine, provided that

(i)   the Directors shall announce a sterling equivalent for any dividend declared in another currency and the date of the intended announcement of such sterling equivalent shall be notified by the Directors when the dividend is declared,

(ii)   the sterling equivalent for any dividend declared in another currency shall be determined in accordance with Article 133(C), and

(iii)   holders of Ordinary Shares shall be entitled to be paid dividends in sterling

ROA.14-20466.41, ¶94; ROA.14-20466.611.

BP's directors undertook the following acts pursuant Article 131(C) of BP's Articles of Association, which applies only to dividends declared pursuant to Article 131(A) or Article 131(B): (a) they de-

clared the dividend in U.S. dollars, announcing that "[t]he quarterly dividend, to be paid on 21 June 2010, is 14 cents per share ($0.84 per ADS), the same as a year ago;" (b) they noted that "[t]he corresponding amount in sterling will be announced on 8 June 2010;" (c) on June 8, 2010, they announced that "the amount of sterling dividend payable in cash on 21 June 2010 will be: 9.5568 pence per share;" and (d) they announced that "[s]terling dividends payable in cash will be converted from US dollars at an average of the market exchange rate over the four dealing days from 2 June 2010 to 7 June 2010 (£1 = US$1.46492)." ROA.14-20466.41-42, ¶95; ROA.14-20466.167, 198.

By declaring an ordinary dividend pursuant to Article 131(B), BP directors acted consistently with their obligations with respect to the declaration and payment of dividends. ROA.14-20466.43, ¶99. BP directors also ensured that BP complied with the dividend notice requirements under SEC Rule 10b-17 and the NYSE Listing Company Manual §204.12, which require, among other things, a disclosure describing the details of any condition which must be satisfied to enable payment of the dividend. ROA.14-20466.44, ¶100.

BP's directors have authority to specify a record date with respect to any dividend pursuant to Article 143 of BP's Articles of Association, which provides that "[n]otwithstanding any other provi-

sion of these Articles … the Directors may by resolution specify any date ('record date') as the date … on which persons registered as the holders of shares or other securities shall be entitled to receipt of any dividend …." ROA.14-20466.44, ¶101; ROA.14-20466.616. Article 143 is an exchange-oriented provision that allows BP's directors to fix BP's obligations with respect to dividends as of a specified record date. ROA.14-20466.44, ¶101. Because a specified record date fixing shareholders' entitlement to dividends is necessary to the proper functioning of the securities markets, sections 204.12 and 703.02(b) of the NYSE Listing Company Manual require that listed companies specify a record date for any announced dividend and that the record date only occur after the date on which it is definitely determined that the dividend will be paid. *Id.*

Consistent with market requirements, BP's directors exercised their authority under Article 143 and specified a record date of May 7, 2010, for the 2010 first quarter dividend: "The dividend is payable on 21 June 2010 to shareholders and ADS holders on the register on 7 May 2010." ROA.14-20466.45, ¶102; ROA.14-20466.168. Accordingly, the right to that dividend attached to BP's ADS shares on May 7, 2010. ROA.14-20466.45, ¶102. The declaration of the first quarter

dividend and record date created a binding obligation on the part of BP to pay the declared dividend on June 21, 2010. *Id., ¶103.*

Plaintiff was a BP ADS shareholder of record on May 7, 2010. ROA.14-20466.46, ¶107. As a result, he became a creditor of BP and was entitled to receive a dividend in the amount of $0.84 per ADS share on June 21, 2010. *Id.*

On April 20, 2010, shortly before the dividend was declared, an explosion and fire occurred in the Gulf of Mexico on the Deepwater Horizon drilling rig operated by Transocean Holdings LLC, and on April 22, 2010, the Deepwater Horizon drilling rig sank, resulting in oil flowing unchecked into the Gulf of Mexico from the Macondo well, in which BP held a majority interest. ROA.14-20466.45, ¶104; ROA.14-20466.169.

Although the oil spill was a huge disaster, BP's financial position was so strong that its financial ability to pay for the oil spill clean-up, as well as pay the dividend to its shareholders, was never in question. ROA.14-20466.45, ¶105; ROA.14-20466.175-78.

BP assured its shareholders that it would, and had the financial ability to, pay the dividend it was legally obligated to pay. ROA.14-20466.46, ¶110; ROA.14-20466.190. During a June 4, 2010, webcast to its shareholders, BP committed to "meet [its] obligations to [its] …

hundreds of thousands of shareholders, and millions more in mutual and pension funds, who rely on their investment in BP as part of their financial security and in many cases their retirement income." ROA.14-20466.46, ¶110; ROA.14-20466.190. BP emphasized its strong financial position, stating: "The financial consequences of this [oil spill] will undoubtedly be severe, but BP faces its financial responsibilities as a strong company. Outside this tragic incident, the company is performing well, as we saw with our first quarter results, and our asset base and balance sheet remain amongst the very best." ROA.14-20466.46, ¶110; ROA.14-20466.190. BP further stated: "Under the current trading environment, we are generating significant additional cash flow. In addition, our gearing is currently below the bottom of our targeted range. And our asset base is strong and valuable, with more than 18bn barrels of proven reserves and 63bn barrels of resources at the end of 2009. All of the above gives us significant flexibility in dealing with the cost of the incident." ROA.14-20466.46-47, ¶110; ROA.14-20466.194.

However, paying the dividend then became a political tug of war. ROA.14-20466.47, ¶111. In a speech later the same day, June 4, 2010, President Obama criticized BP's expressed intention to meet its legal obligations to its shareholders. *Id.*

At about the same time, on June 2, 2010, two U.S. Senators sent a letter to BP urging it to suspend payment of the dividend and issued a related press release suggesting that any decision by BP to go forward with a dividend payment would invite scrutiny by the U.S. Justice Department. ROA.14-20466.47, ¶112.

Over the next week, dozens of U.S. Representatives signed onto a similar letter to BP: "We urge you to halt your planned dividend payout and cancel your advertising campaign until you have done the hard work of capping the well, cleaning up the Gulf Coast and making whole those whose very livelihoods are threatened by this catastrophe. Not a moment before then should you return to business as usual." ROA.14-20466.48, ¶113.

On June 16, 2010, following a meeting with President Obama, BP announced that its board of directors had cancelled the "previously declared first quarter dividend." ROA.14-20466.48, ¶115; ROA.14-20466.202. BP emphasized that it was taking the actions in spite of "[its] strong financial position and asset position" and even though [its] business continues to perform well," with strong underlying cash flows. ROA.14-20466.48-49, ¶115; ROA.14-20466.203. BP also announced that it was setting up a $20 billion claims fund that would be funded over time. ROA.14-20466.49, ¶116; ROA.14-20466.202-03.

BP's financial performance during 2010 confirms that setting up the $20 billion fund and paying other costs related to the spill did not impair its ability to pay the dividend. ROA.14-20466.49-50, ¶¶118-21.

On July 27, 2010, BP announced that during the first half of 2010 net cash provided by operating activities totaled $14.4 billion, and that it held $7.3 billion in cash and cash equivalents as of June 30, 2010. ROA.14-20466.49-50, ¶119. For the first half of the year BP disclosed a loss of about $11.1 billion that reflected a pre-tax charge of more than $32 billion related to the oil spill, including a charge of $20 billion related to the escrow announced by BP following its June 16, 2010, meeting with President Obama. ROA.14-20466.50, ¶119.

On November 2, 2010, BP announced a third quarter profit of nearly $1.8 billion, and for the first nine months of the year BP disclosed a loss of less than $9.3 billion despite a pre-tax charge of $39.9 billion related to the oil spill. ROA.14-20466.50, ¶120.

On February 1, 2011, BP announced a fourth quarter profit for 2010 of more than $5.5 billion, and for the full year in 2010, BP disclosed a loss of less than $3.8 billion despite a pre-tax charge of $40.9 billion related to the oil spill. ROA.14-20466.50, ¶121. BP also announced that its board of directors had declared a quarterly dividend

in respect of the fourth quarter of 2010 in the amount of $0.07 per ordinary share and $0.42 per ADS payable on March 28, 2011. *Id.*

## V.    SUMMARY OF ARGUMENT

This case belongs in the United States—the country where plaintiff resides and of which he is a citizen, the country where plaintiff chose to file suit, the country where plaintiff suffered harm, the country where plaintiff purchased the shares that entitle him to the dividend he seeks, the country on whose stock exchange BP voluntarily listed the shares that plaintiff purchased, the country where the single largest segment of BP's global operations is located, and the country where BP has engaged in billions of dollars' worth of economic activity over the last forty years.

In granting BP's motion to dismiss on *forum non conveniens* grounds, the district court abused its discretion. It misinterpreted the law, ignored and unreasonably discounted certain facts, made erroneous conclusions unsupported by the evidence, and failed to hold BP to its burden of proof as to several of the private and public interest factors. The decision to grant BP's motion was based, principally, on a single set of conclusions: that English law will apply to some of the issues in the case (namely, issues concerning the nature and revocability of the dividend declared by BP in April 2010), that plaintiff's claims

are weak, and that an English court is better suited to decide claims involving issues of English law that the court believes lack merit. Not only are the last two conclusions out-of-bounds in a *forum non conveniens* analysis, but the first conclusion is far from a reasonable justification for denying plaintiff access to United States courts.

The district court's order of dismissal and resulting judgment should be reversed.

## VI.    ARGUMENT[3]

### A.    Standard of Review

A district court's decision on a motion to dismiss based on *forum non conveniens* is reviewed for abuse of discretion. *Schexnider v. McDermott Intern., Inc.*, 817 F.2d 1159, 1161 (5th Cir. 1987). "In the context of a *forum non conveniens* ruling, a district court abuses its dis-

---

[3] The *Glenn* case was filed in the Southern District of New York, ROA. 14-20466.6-58, and then transferred to the Southern District of Texas as part of the BP MDL proceedings centered in that district, ROA.14-20466.98-99. Such transfers "accomplish[] but a change of courtrooms." *In re Ford Motor Co.*, 591 F.3d 406, 413 n.5 (5th Cir. 2009) (citations and quotations omitted). Thus, where a case is transferred for the purpose of coordinated MDL pretrial proceedings, the transferee court applies the law of the transferor court, at least with respect to questions regarding *forum non conveniens*. *Id.*; *see also In re Chinese Manufactured Drywall Prod. Liab. Litig.*, 742 F.3d 576, 586 (5th Cir. 2014) ("In *Ford Motor* we held that the transferee court should apply the transferor court's interpretation of federal law when addressing issues of forum-availability."). Because the *Glenn* case originated in New York, the federal law that applies to the *forum non conveniens* issue on appeal is that of the Second Circuit. However, the district court here committed reversible error under the law of either the Second or Fifth Circuits.

cretion when its decision rests either (1) on an error of law, or (2) on a clearly erroneous finding of fact, or (3) if a court fails to consider all the relevant factors or unreasonably balances those factors." *Gross v. British Broadcasting Corp.*, 386 F.3d 224 (2d Cir. 2004); *see also Resolution Trust Corp. v. Bright*, 6 F.3d 336 (5th Cir. 1993) ("A court abuses it discretion when its ruling is based on an erroneous view of the law or on a clearly erroneous assessment of the evidence.").

## B.    The *Forum Non Conveniens* Framework

In deciding a *forum non conveniens* motion, the first step is to determine the amount of deference to be afforded the plaintiff's choice of forum. *Gross*, 386 F.3d at 230. Then, the court must determine if an alternative forum exists. *Id.* The last step is to balance the private and public interest factors announced in *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 507 (1947), to decide whether the case should be dismissed in favor of the forum proposed by the defendant. *Gross*, 386 F.3d at 230.[4]

---

[4] The private interest factors are: (1) ease of access to evidence; (2) the availability of compulsory process for the attendance of unwilling witnesses; (3) the cost of willing witnesses' attendance; (4) if relevant, the possibility of a view of the premises; and (5) all other factors that might make the trial quicker or less expensive. *DiRienzo v. Philip Servcs. Corp.*, 294 F.3d 21, 29-30 (2d Cir 2002). The public interest factors are: (1) administrative difficulties associated with court congestion; (2) the unfairness of imposing jury duty on a community with no relation to the litigation; (3) the local interest in having localized controversies decided at home; and (4) avoiding difficult problems in conflict of laws and the application of foreign law. *Id.*, 294 F.3d at 31.

The burden of demonstrating inconvenience under the *forum non conveniens* elements is on the defendant. *DiRienzo*, 294 F.3d at 29-30; *see also In re Air Crash Disaster Near New Orleans, Louisiana on July 9, 1992*, 821 F.2d 1147, 1165 (5th Cir. 1987), *vacated on other grounds sub nom. Pan Am. World Airways, Inc. v. Lopez*, 490 U.S. 1032 (1989). "Plaintiffs should not … [be] deprived of their choice of forum except upon defendants' clear showing that a trial in the United States would be so oppressive and vexatious as to be out of all proportion to plaintiffs' convenience." *DiRienzo*, 294 F.3d at 30, *citing Koster v. (American) Lumbermens Mut. Casualty Co.*, 330 U.S. 518, 524 (1947). A court commits legal error by failing to hold a defendant to its burden of proof. *DiRienzo*, 294 F.3d at 30.

In this case, while the district court correctly determined that plaintiff's choice of forum was entitled to substantial deference, and could only be overcome if the balance of private and public interest factors "is strongly in favor of the defendant," ROA.14-20466.1072, *Glenn*, 2014 WL 2765777, *4, in considering and balancing those factors the court abused its discretion.

**C.    The District Court Abused its Discretion in Basing its Dismissal Principally on its Conclusions that Plaintiff's Claims Require the Interpretation of English Law, that Plaintiff's Claims Are Weak, and that Claims Involving English Legal Issues a Court Believes Are Weak Should Be Heard in England**

After the district court found that an English court would be an adequate forum, that plaintiff's choice of forum was entitled to substantial deference, and that the private interest factors weighed slightly in BP's favor, it moved on to the public interest factors. ROA.14-20455.1070-76; *Glenn*, 2014 WL 2765777, *3-*7.

The court held that the public interest factors weighed strongly in favor of dismissal—so strongly, in fact, that they overcame the substantial deference given to plaintiff's choice of forum, ROA.14-20466.1081, *Glenn*, 2014 WL 2765777, *9. Its holding, however, was based principally on its finding that English law applies to some issues in the case, its belief that plaintiff's claims are weak, and its conclusion that claims involving English legal issues the court considers weak should be heard in England. According the court:

> The Court has performed a preliminary review of the merits of Mr. Glenn's claims and has determined that the weight of English authority appears to be *against* him. Thus, it appears to the Court—at least at this early stage—that Mr. Glenn is seeking to test the outer limits of

> English law. Such an exercise is much better attempted in
> front of a tribunal deeply ensconced in the relevant law.

ROA.14-20466.1080; *Glenn*, 2014 WL 2765777, *8 (emphasis in original).

The court gave little more than a nod to the court congestion factor—which BP did not even address—and only insofar as it declared an obvious fact that is not the intended focus of the congestion inquiry: dismissing the case would mean one less case on the court's docket. ROA 14-20466.1078; *Glenn*, 2014 WL 2765777, *8.

The court also found that the local interest factor weighed in favor of English courts—but just barely, ROA.14-20466.1078, *Glenn*, 2014 WL 2765777, *7—and only then because the case involved an issue of English law. This same reasoning was used to find that it would be a burden on an American jury to hear the case. ROA.14-20466.1078; *Glenn*, 2014 WL 2765777, *8.

In other words, despite the fact that the local interest and jury duty factors are independent from the factor concerning foreign law, the district court treated them as derivative of and subordinate to the foreign law factor. Once it concluded that English law would apply to some issues in the case, its analysis was done.

The court's erroneous interpretation and application of these factors, and the overriding significance it gave to the need to apply English law, was an abuse of discretion.

### 1. The district court improperly considered the merits of plaintiff's claims

A motion to dismiss based on *forum non conveniens* is not directed at the merits of a claim; its purpose is to persuade the court that having a trial in the plaintiff's chosen forum would be oppressive and vexatious for the defendant. Consequently, when a court decides such a motion, the merits of the plaintiff's claims are irrelevant. As the Second Circuit explained in *Manu Int'l, S.A. v. Avon Products, Inc.*:

> The doctrine of forum non conveniens is intended to avoid trial in inappropriate forums, not to avoid meritless suits. If this is such a suit, Avon can be protected by the trial judge's using his discretionary powers to force Manu, if it wants the testimony of Avon overseas representatives, to advance the expenses of bringing them here or counsel fees for taking their depositions abroad. Unless Manu can prove an exclusive dealing contract with Chu and that Avon induced breach, much of Manu's action may be dismissible on motion for summary judgment. But the forum non conveniens route, appealing as it is to busy judges, is not the proper way to go about this.

641 F.2d 62, 68 (2d Cir. 1981); *see also Ahnwick v. European Micro Holdings, Inc.*, 29 Fed.Appx. 781, 784 (2d Cir. 2002) ("Though the

District Court has indicated skepticism about the viability of plaintiffs' fraud claims, the *Gilbert* factors do not include consideration of the merits of a particular claim or lawsuit on a motion to dismiss for *forum non conveniens*.").

In this case, the district court deviated from this principle and used its "preliminary review of the merits of [plaintiff's] claims" to decide that "English authority appears to be *against* [plaintiff]," to overweight the foreign law factor with this extraneous and improper conclusion, and to tip the scales in favor of dismissal. ROA.14-20466.1080; *Glenn*, 2014 WL 2765777, *8-*9.

The court should not have considered the merits of plaintiff's claim, and it abused its discretion in doing so.

> **2.      The district court gave no weight to the fact that the applicable English law in this case is well developed**

Having improperly determined that plaintiff's claims lacked substantive support from English law, the district court compounded its error by reaching another remarkable, and unsupportable conclusion: that claims the court believes are weak and require the interpretation of foreign law should not be decided by U.S. courts.

As the sole support for its conclusion, the court cited to *Gilstrap v. Radianz Ltd.*, 443 F.Supp.2d 474 (S.D.N.Y. 2006). *Gilstrap* is ques-

tionable authority in light of the Second Circuit's pronouncement in *Manu*, *supra*, and its facts are distinguishable. There, the plaintiffs' claims focused on the alleged breach of a stock option plan which was adopted and subsequently amended in England, and which governed the rights of employees to purchase English securities that were not traded on any U.S. exchange. The court ultimately found that both private and public interest factors weighed strongly in favor of dismissal. In its discussion of the foreign law factor, the court noted that "plaintiffs concede that, in order to find that the directors of Radianz owed [a fiduciary] duty to the option holders, the Court would have to expand—or read expansively—the scope of a director's fiduciary duty to an English corporation." 443 F.Supp.2d at 491.

In this case, plaintiff made no concessions regarding English law. Instead, he argued that the weight of English authority clearly *supported* his position. *See, e.g.*, ROA.14-20466.661-674.

Furthermore, the *Gilstrap* court's fear over having to interpret foreign law was based in part on its belief that it would have "no clear guides" in doing so. 443 F.Supp.2d at 491.

Prior to its decision in *Glenn*, the district court, in connection with the derivative lawsuits filed against BP in the MDL proceeding, cited a similar lack of guidance as the basis for weighing the foreign

law factor strongly in favor of dismissal. *In re BP Shareholder Derivative Litig.*, 2011 WL 4345209, *14 (S.D.Tex. 2011), *aff'd sub nom. City of New Orleans Employees' Retirement Sys. v. Hayward*, 508 Fed.Appx. 293, 300 (5th Cir. 2013) ("The court explained that the specific English statute that would be applied, the U.K. Companies Act, was enacted recently, thereby leaving the U.S. court with little jurisprudence that would direct it in how to apply the statute properly.").

Assuming, *arguendo*, that in the proper case a court may reasonably find that a lack of applicable foreign law strongly favors dismissal, this is not such a case. In stark contrast to the derivative lawsuits, here the district court observed (even as it failed to give any weight to its observation) that "the parties' experts generally agree as to what authority is applicable—although they disagree about how to apply it—and there is much of it from which to draw." ROA.14-20466.1080; *Glenn*, 2014 WL 2765777, *9 n. 9. Thus, the court will not be faced with one of "those areas [of foreign law], perhaps interstitial but far from inconsequential, where [it has] no clear guides," *Gilstrap*, 443 F.Supp.2d at 491 (internal quotation marks and citation omitted); rather, it is faced with an area in which the law is fully developed.

Indeed, the district court declared in yet another MDL case—the securities litigation filed against BP—that it "is certainly capable of

applying English law, which shares so many strong similarities with U.S. law due to a common heritage." *In re BP P.L.C. Securities Litig. (Alameda County Employees' Ret. Ass'n)*, 2013 WL 6383968, *55 (S.D.Tex. 2013); *see also In re BP P.L.C. Securities Litig. (Avalon Holdings, Inc.)*, No. 4:12-cv-3715, slip op. (S.D.Tex. Sept. 30, 2014) (retaining jurisdiction over fraud claims against BP under English law, including claims brought by English entities who purchased BP shares on the London Stock Exchange); *Gross*, 386 F.3d at 234 ("We note … that there are few if any countries in the world whose body of law is more amenable to application in the United States than Great Britain's[,] … and we do not believe the application of such law creates a burden on this court.").

There was no reasonable basis for the court's reluctance to decide the English law issues implicated by plaintiff's claims.

> **3.    The district court failed to take into account that plaintiff's claims are subject to a New York choice-of-law provision and that any court deciding the case will have to look at both New York and English law**

The district court's conclusion that the foreign law factor weighed strongly in favor of dismissal was also unreasonable because it failed to take into account that plaintiff's claims—assumpsit, money had and received, unjust enrichment, and breach of contract—are all

governed by a New York choice-of-law provision, ROA.14-20466.657, 846, and that any court (U.S.-based or English) hearing plaintiff's claims will have to look at both New York and English law.

Instead, the court concluded that New York law would not "factor significantly" in the case based on the parties' briefing on BP's motions to dismiss:

> The Court is also skeptical of Mr. Glenn's claim that New York law will factor significantly in this case. Both parties have expended considerable time and resources to procure through affidavits from English law experts on the merits of Plaintiff's claims. It is unlikely that the parties would have gone through these motions unless they were confident that English law would determine the outcome of Plaintiff's claims.

ROA.14-20466.1080; *Glenn*, 2014 WL 2765777, *9.

The district court went too far. The weight of the foreign law factor cannot be influenced by a defendant's tactical decision to combine a motion on *forum non conveniens* with a Rule 12(b)(6) motion that focuses entirely on the merits of foreign law issues. Yet, that is exactly what happened here.

All four of plaintiff's claims are common law claims based, as they must be, on New York law. Even if plaintiff prevails on the English law issues concerning the nature and revocability of the dividend declared by BP in April 2010, plaintiff will still have to prove, under

New York law, every element of every claim; BP certainly has not conceded that once the English law issues are decided that plaintiff will be entitled to final judgment in his favor on all claims.

Any court hearing this case will have to apply the laws of both countries. That is sufficient to neutralize the foreign law factor. *DiRienzo*, 294 F.3d at 31 ("[W]hile an Ontario court would likely apply American law to at least the claims under §§ 11 and 12(a) of the Securities Act, an American court would likely apply Canadian law to claims by non-resident class members, based on the purchase of securities outside the United States. The interest in avoiding the application of foreign law therefore does not favor either forum." [internal citations omitted]).

By failing to properly consider and weigh the need to apply New York law to plaintiff's claims, the district court erred.

### D. The District Court Abused its Discretion in Finding that the Public Interest Factors Outweighed the Substantial Deference to Plaintiff's Choice of Forum Because, in Addition to Giving Too Much Weight to the Need to Interpret English Law, It Made Unreasonable Conclusions Unsupported by the Evidence as to Court Congestion and Local Interest

The district court's analysis of the public interest factors erred principally for the reasons explained above. But the court also abused its discretion by misapplying the court congestion factor and failing to

articulate any independent bases for determining that the local interest and jury burden factors weighed at all in favor of dismissal.

> 1. **There was no evidence offered on the relative congestion of the Southern District of Texas, the Southern District of New York, or English courts**

It was BP's burden to make a showing as to every *forum non conveniens* factor, yet BP completely ignored the court congestion factor in its briefing in the lower court. ROA.14-20466.139-40, 1025-28. This omission was of no concern to the district court, which held the factor weighed in favor of dismissal anyway. That alone was error. *DiRienzo* ("the district court committed a legal error by failing to hold defendants to their burden of proof").

It was also error for the court to hold that this factor weighed in favor of dismissal based solely on the fact that dismissal would mean one less case on the court's docket.[5] If that were the test, there would be no need for court congestion to be a factor at all; dismissing any case has, *ipso facto*, "an immediate and positive effect on [a] Court's workload." ROA.14-20466.1079; *Glenn*, 2014 WL 2765777, *8.

---

[5] The district court also focused solely on its own docket, without considering that of the Southern District of New York, where the case would be tried. 28 U.S.C. § 1407(a) (requiring the remand of cases transferred for consolidated MDL pre-trial proceedings back to transferor courts at or before the conclusion of such proceedings); *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 37 (1998) (referring to the remand requirement as an "unconditional command").

The *forum non conveniens* doctrine is not a remedy for court congestion. As the Ninth Circuit explained, "[t]he real issue is not whether a dismissal will reduce a court's congestion but whether a trial may be speedier in another court because of its less crowded docket." *Gates Learjet Corp. v. Jensen*, 743 F.2d 1325, 1337 (9th Cir. 1984). However, BP offered no evidence at all on this factor, let alone the sort of evidence relating to the state of English court dockets that might have provided a basis for a determination by the district court.

For both of these reasons, the district court abused its discretion in finding this factor to weigh in favor of dismissal.

**2.    New York and the United States have an interest in the lawsuit, and it is appropriate to have a United States jury hear it**

The district court articulated no independent bases for finding that the local interest and jury burden factors weighed in favor of dismissal. Instead, it conflated those two factors with the foreign law factor and held that, because issues surrounding BP's declaration and purported cancellation of the April 2010 dividend would be governed by English law, the local interest factor "favors an English forum[,]" and "it would be inequitable to burden the citizens of New York with the task of adjudicating [plaintiff's] rights." ROA.14-20466.1078; *Glenn*, 2014 WL 2765777, *7-*8.

Beyond the district court's error in lumping those three factors together, the court erred in completely discounting the interests of New York and the United States in this litigation. With respect to the local interest factor, courts "ask only if there is an identifiable local interest in the controversy, not whether another forum also has an interest." *Boston Telecomm. Group, Inc. v. Wood*, 588 F.3d 1201, 1212 (9th Cir. 2009) (internal quotation marks and citation omitted). Where the local forum has an identifiable interest, the factor is rendered neutral even if the alternative forum has an interest. *Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88, 107 (2d Cir. 2000) ("To the same extent that England may have an interest in adjudicating matters affecting a British corporation, the Unites States courts have an interest in adjudicating matters affecting its residents."); *Gross*, 386 F.2d at 234 (local interest factor was neutral where "Gross is from New York and the BBC is from Great Britain, so each forum can claim a connection to one of the parties"); *cf. Carey v. Bayerische Hypo-Und Vereinsbank AG*, 370 F.3d 234, 238 (2d Cir. 2004) (no connection to the United States where, even though plaintiff was a U.S. citizen, the transactions at issue with the German defendant took place while she was living in Germany).

BP and the district court acknowledged that New York, and the United States, have an interest in this case, at the very least given the fact that BP's ADSs are traded on the NYSE. ROA.14-20466.140; ROA.14-20466.1077; *Glenn*, 2014 WL 2765777, *7. BP offered no explanation for why that interest should not be considered, and the district court offered a radical view of the local interest factor sharply at odds with prevailing law:

> As the Court sees it, the issue posed by this public interest factor is which locality is interested in the dispute, *beyond* the interests of the parties themselves. It is difficult to imagine that this particular lawsuit will capture much local interest in either the U.S. or in England. To the extent that Mr. Glenn relies upon BP's decision to exploit the U.S. capital markets, suggesting that it imbues New York with a special interest in BP's corporate governance, the same argument can be made about any locality with a stock exchange listing BP's securities. The Court does not find such an interest to be particularly strong *or* localized.

ROA.14-20466.1077-78; *Glenn*, 2014 WL 2765777, *7 (emphasis in original). Not only did the district court erroneously infuse the local interest factor with a requirement that a certain quantum of the local population be personally interested in the litigation, but it unreasonably discounted the undisputed interest of New York and the United States in this case by declaring that their interest is not unique.

Whether or not the interest is unique is irrelevant. *Boston Telecomm. Group*, 588 F.3d at 1212 ("We do not suggest that California's interest in this controversy must somehow be unique or not shared with any other forum.").

Reasoning similar to the district court's was rejected by the Second Circuit in *DiRienzo*. There, in a case involving securities fraud against a Canadian corporation whose shares were traded on Canadian and U.S. exchanges, the trial court had found that the local interest factor weighed heavily in favor of litigation in Canada based on its finding that the case predominantly concerned the conduct of a Canadian corporation in Canada. In reversing the trial court, the Second Circuit cited the amicus brief from the SEC, which explained that it made no more sense to dismiss the case than it would a products liability case involving a product designed and manufactured abroad but purchased in the United States. *DiRienzo*, 294 F.3d at 32. The same goes here.

Moreover, the vehicle for allowing BP to offer its shares on the NYSE is the Deposit Agreement, which provides that dividends are to be paid to the Depository in New York, and that the Depository will in turn distribute those dividends to ADS holders such as plaintiff. ROA.14-20466.11, ¶22. That is a sufficient local interest to weigh the

factor in plaintiff's favor or, to the extent England also has an interest, render it neutral. *Banco Cafetero (Panama) S.A. v. Republic of Peru*, 1995 WL 494573, *4 (S.D.N.Y. 1995) (in a suit to recover debt owed to the plaintiff, court denied motion to dismiss based on *forum non conveniens*, in part because "New York has an interest in this litigation in that … New York is the designated place of performance of the Deposit Agreement and Rollover Agreements.").

Plaintiff is a resident and citizen of the United States who purchased BP ADSs traded on the NYSE, and seeks to represent a class of investors who made similar purchases; purchases made possible by BP's decision to exploit capital markets in the United States by registering its shares with the SEC and placing those shares in the hands of a New York-based Depository.

Plaintiff and the other class members purchased their shares pursuant to a Deposit Agreement with a New York choice-of-law provision, and the only claims in the case are New York state law claims.

Plaintiff suffered harm, in the form of a lost dividend payment, in the United States. His losses and the losses of the other ADS holders he seeks to represent, in contrast to the claims in the derivative litigation, are no more localized in England than the plaintiffs' losses in *DiRienzo* were localized in Canada. *DiRienzo*, 294 F.3d at 32; *cf. City of*

*New Orleans Employees' Retirement Sys.*, 508 Fed.Appx. at 299 (noting that district court's finding that local interest factor favored dismissal was based on the fact that the lawsuit was "intended to compensate the British company BP for its financial and reputational harms").

There is no reasonable basis on which to find that neither New York nor the United States has an interest in this case. Moreover, "[b]ecause both jurisdictions have some interest in this dispute, the concern with burdening jurors is not present." *Capital Currency Exchange, N.V. v. Nat'l Westminster Bank PLC*, 155 F.3d 603, 611 (2d Cir. 1998); *see also Gilbert*, 330 U.S. at 508 (jury burden factor only implicated where jury duty would be "imposed upon the people of a community with no relation to the litigation").

The district court abused its discretion in finding these factors to favor dismissal.

### E. The District Court Abused its Discretion in Finding that the Private Interest Factors Weighed, Even Slightly, in Favor of Dismissal, Because Litigating in the United States Would Not Be Inconvenient for BP

Other than correctly holding that the compulsory process factor was neutral, the district court erred in finding that the other private interest factors weighed in favor of dismissal—even slightly—because

litigating this case in the United States would not be an oppressive or vexatious inconvenience to BP.

### 1. Relevant documents are under the control of BP, and under the control of third parties located in the United States

The district court erred by weighing the access-to-evidence factor at all in favor of dismissal, given that (a) any original documents located in England (which have not already been duplicated and sent or made available to individuals in the United States) are in the possession of BP, a party to the litigation, and (b) the only third party documents identified by anyone as potentially relevant to the case are located in the United States.

Especially in a case like this one, where the claims are not tied to a specific physical location and physical evidence such an airplane or an automobile or a piece of real property are not involved, the access-to-evidence factor does not necessarily turn on where the evidence can be found. *Wiwa*, 226 F.3d at 107; *Gross*, 386 F.3d at 233. Instead, where a defendant such as BP is relying on the purported location of documents, the defendant has the burden of showing that making those documents available to the plaintiff would be oppressive or vexatious. *DiRienzo*, 294 F.3d at 30; *Wiwa*, 226 F.3d at 107 ("de-

fendants have not demonstrated that these costs are excessively bur-
densome"). BP did not make the required showing.

The only documents BP asserted can be found in England are
those under its control. ROA.14-20466.137, 1023, 1072; *Glenn*, 2014
WL 2765777, *5. Access to such evidence is by definition easy, since
documents possessed by a party "can be brought to court wherever the
forum." *Neuralstem, Inc. v. ReNeuron, Ltd.*, 365 Fed.Appx. 770, 772
(9th Cir. 2010) (court erred by failing to consider that "most if not all
of the documentary evidence located in England is within ReNeuron's
control"); *see also Tempur-Pedic Intern., Inc. v. Go Satellite Inc.*, 758
F.Supp.2d 366, 380 (N.D.Tex. 2010) ("Defendants have access to
their own records … whether this case is litigated in Texas or British
Columbia, and the court can compel parties to produce discovery.").

BP did not contend otherwise. BP did not even argue, let alone
show, that making documents located in England available to plaintiff
would be oppressive or vexatious. ROA.14-20466.137, 1023-24. BP
did not argue that the documents are located only in England,[6] that
the documents would have to be boxed up and shipped to the United
States at enormous expense, or that the documents could not be made

---

[6] Based on BP's submission to the trial court of a subset of its "English" documents
in support of its motion to dismiss under FRCP 12(b)(6), ROA.14-20466.158-60,
162-63, it is evident that BP's documents are not located only in England, and
some, if not all of them, are already in the possession of BP's New York counsel.

available electronically using the same methods that would be used wherever the litigation was located. The district court weighed the factor in favor of BP anyway. That was error.

BP also made no showing whatsoever regarding access to third party documents should the case proceed in an English forum. This is important, because the only potentially relevant third party documents referenced by the parties below are those of third parties located in the United States. ROA.14-20466.1073, *Glenn*, 2014 WL 2765777, *5. The district court discounted these documents entirely, ROA.14-20466.1073, *Glenn*, 2014 WL 2765777, *5, even though BP conceded that at least some of these documents would be relevant for purposes of identifying putative class members. ROA.14-20466.1024.

By failing to require BP to meet its burden of proof, and failing to properly weigh the potential problems associated with discovery of third party documents, the district court abused its discretion.

2.    **There is no evidence on the cost of bringing willing witnesses to trial, and BP's vast economic resources weigh against having the case tried abroad**

The witness cost factor is concerned only with the cost of obtaining the attendance of willing witnesses. *DiRienzo*, 294 F.2d at 29; *Gilbert*, 330 U.S. at 508. Despite this, the district court erroneously

expanded the factor to include all "relevant witnesses for trial and discovery," including former BP board members and non-board members it considered to be unwilling for purposes of the compulsory process factor. ROA.14-20466.1075; *Glenn*, 2014 WL 2765777, *6. Then, without considering anything other than the witnesses' residence, it found that the factor "weighs solidly in BP's favor." ROA.14-20466.1076; *Glenn*, 2014 WL 2765777, *6.

By the time it came to the witness cost factor, the district court had already found that BP's eight current directors were willing witnesses because "BP will be able to secure their participation." ROA.14-20466.1075; *Glenn*, 2014 WL 2765777, *6. The district court considered BP's eight former directors, and the six non-directors, to be unwilling witnesses. ROA.14-20466.1075; *Glenn*, 2014 WL 2765777, *6.

Significantly, of the eight willing witnesses identified by the parties, BP was not able to identify even one witness who resides in the United Kingdom, let alone England. Three of the witnesses reside in the United States, one resides in Sweden, one in the Netherlands, and three in unknown locations (although one of those whose residence is unknown is a U.S. citizen, and BP admitted that, even some of those who may "reside or work outside the United States … have interests

in property in and occasionally travel to the United States"). ROA.14-20466.1074; *Glenn*, 2014 WL 2765777, *5 & n. 4; ROA.14-20466.573. The only reasonable conclusion the district court could have reached is that, of the willing witnesses whose residences are known, most of them are located in the United States. The district court strayed far from that conclusion, and in doing so erred.

In addition, the district court erred by finding that the factor weighed in favor of dismissal in the absence of any findings regarding the actual cost of procuring witnesses for deposition or trial. It made no findings, for instance, regarding whether the witnesses would have to travel at all for depositions or trial, or whether the cost to BP of transporting willing witnesses residing in England (assuming there are any) to New York would be greater than transporting willing witnesses residing in the United States to London.

The court also failed to properly weigh the fact that "the burden of litigating abroad is likely a greater obstacle to an individual than to a large business corporation." *Gross*, 386 F.3d at 233; *see also Wiwa*, 226 F.3d at 107 (defendants could not override the plaintiffs' choice of forum based on purported costs of litigating in the United States, where "defendants have not demonstrated that these costs are excessively burdensome, especially in view of the defendants' vast

resources," and "the additional cost and inconvenience to the defendants of litigating in New York is fully counterbalanced by the cost and inconvenience to the plaintiffs of requiring them to reinstitute the litigation in England—especially in comparison to the vast resources of the defendants.").

For all these reasons, the district court abused its discretion in finding the witness cost factor to favor dismissal.

### 3. Class actions like this one are not available in England, and a single case in the United States is much more efficient than a series of individual lawsuits clogging English courts

If this case cannot proceed as a class action in the United States, and BP shareholders have to litigate their right to the dividend payment in England, it is possible that English courts would be clogged with multiple shareholder suits, creating inefficiencies and expenses that could otherwise be avoided by allowing the case to proceed here. *Cromer Finance Ltd. v. Berger*, 158 F.Supp.2d 347, 362 (S.D.N.Y. 2001) ("If the case were dismissed from New York, however, the procedural mechanisms of joinder and class certification available in New York may be unavailable and the individual plaintiffs might very well decide to bring separate suits in Bermuda or perhaps across the world. Multiplicitous global litigation or even a multiplicity of separately filed

actions in Bermuda would exponentially increase the cost and burden on all of the parties."); *In re Lernout & Hauspie Sec. Litig.*, 208 F.Supp.2d 74, 93 (D. Mass. 2002) ("the confusion and expense associated with forcing each class member in the United States to individually sue defendants in Belgium would be tremendous and strongly weigh against dismissal").

Litigating in England would also eliminate the advantage of the pre-trial efficiencies associated with the MDL proceeding itself. As BP argued to the Judicial Panel on Multidistrict Litigation ("JPML") when it supported transferring the *Glenn* case from the District of Oregon to the MDL court: "[t]here thus can be no serious debate that both this action and the securities action pending as part of MDL 2185 raise common factual questions about the BP Board's decision to suspend the June 2010 dividend payments and the effect of that suspension on BP ADS holders." ROA.14-20466.831. BP asserted that "[i]n presiding over the other Deepwater Horizon-related actions brought by BP shareholders, Judge Ellison will gain familiarity with many of the factual and legal issues raised in this action, including potentially questions of English law." ROA.14-20466.831. BP also contended that "[e]fficiency would be best served by having a single judge supervise discovery in all of these shareholder cases[,]" and that "[i]t would be

undeniably more convenient and efficient for a single federal district court to coordinate any discovery sought from these Board members and any related BP witnesses." ROA.14-20466.836-37.

BP did not address the efficiency factor in the district court, except to assert, relying on the declaration of British lawyer Martin Moore, that a class action could be brought in England. ROA.14-20466.1025. However, after opining about the availability of certain collective actions in England, Mr. Moore makes it clear how limited those collective action procedures are, if they would even apply to plaintiff's claims. ROA.14-20466.1051; *see also* ROA.14-20466.1076; *Glenn*, 2014 WL 2765777, *6 (recognizing that "[a]t least one other court has acknowledged limitations on the use of class-based and representative lawsuits in England in its forum non conveniens analysis"). And BP failed to account for its arguments to the JPML in support of the transfer of the *Glenn* case to Judge Ellison in the first place.

The district court appears to have assigned no weight to the efficiency factor either way, ROA.14-20466.1076, *Glenn*, 2014 WL 2765777, *6, but this was error insofar as it should have weighed it in favor of plaintiff.

## VII.   CONCLUSION

For the foregoing reasons, plaintiff respectfully requests that this Court reverse the district court's order granting BP's motion to dismiss based on *forum non conveniens*, reverse the resulting judgment, instruct the district court to retain jurisdiction over the case, and remand the case for further proceedings.[7]

DATED this 6th day of November, 2014.

STOLL STOLL BERNE LOKTING
& SHLACHTER P.C.

By: /s/ Mark A. Friel
    Keith A. Ketterling
    Mark A. Friel
    Jennifer S. Wagner

209 S.W. Oak Street, Suite 500
Portland, OR 97204
Telephone:  (503) 227-1600
Facsimile: (503) 227-6840

Of Attorneys for Plaintiff-Appellant

---

[7] Because the district court abused its discretion and its order and judgment are subject to reversal, the court need not remand for reconsideration of the *forum non conveniens* motion. Rather, the court can remand to the trial court for a decision on BP's motion to dismiss under Fed.R.Civ.P. 12(b)(6). *Schexnider*, 817 F.2d at 1164 (reversing dismissal based on *forum non conveniens* and remanding with instructions to retain jurisdiction); *Wiwa*, 226 F.3d at 108 (stating, in connection with reversal of *forum non conveniens* dismissal: "Because the district court dismissed for *forum non conveniens*, it never considered the defendants' motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. We remand for consideration of that motion.").

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system on November 6, 2014.

I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system to:

Thomas W. Taylor
ANDREWS KURTH LLP
600 Travis, Suite 4200
Houston, TX 77002
ttaylor@andrewskurth.com


Of Attorneys for Defendant-
Appellee

Richard C. Pepperman, II
Marc De Leeuw
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004
peppermanr@sullcrom.com
deleeuwm@sullcrom.com

Daryl A. Lidbow
Amanda Flug Davidoff
SULLIVAN & CROMWELL LLP
1700 New York Avenue, N.W.
Suite 700
Washington, DC 20006
libowd@sullcrom.com
davidoffa@sullcrom.com

Of Attorneys for Defendant-
Appellee

DATED this 6th day of November, 2014.

STOLL STOLL BERNE LOKTING
& SHLACHTER P.C.

By: /s/ Mark A. Friel
    Keith A. Ketterling
    Mark A. Friel
    Jennifer S. Wagner

209 S.W. Oak Street, Suite 500
Portland, OR 97204
Telephone:  (503) 227-1600
Facsimile: (503) 227-6840

Of Attorneys for Plaintiff-Appellant

## CERTIFICATE OF COMPLIANCE WITH
## FED.R.APP.P. 32(a) AND FIFTH CIRCUIT RULE 32

1.     This brief complies with the type-volume limitation of Fed.R.App.P. 32(a)(7)(B) because this brief contains 11,617 words, excluding the parts of the brief exempted by Fed.R.App.P. 32(a)(7)(B)(iii).

2.     This brief complies with the typeface requirements of Fed.R.App.P. 32(a)(5) and Fifth Circuit Rule 32.1, and the type style requirements of Fed.R.App.P. 32(a)(6), because this brief has been prepared in a proportionally-spaced typeface using Microsoft Word 2007 Goudy Old Style, with the text in 14 point and the footnotes in 12 point.

DATED this 6th day of November, 2014.

STOLL STOLL BERNE LOKTING
& SHLACHTER P.C.

By: /s/ Mark A. Friel
        Keith A. Ketterling
        Mark A. Friel
        Jennifer S. Wagner

209 S.W. Oak Street, Suite 500
Portland, OR 97204
Telephone: (503) 227-1600
Facsimile: (503) 227-6840

Of Attorneys for Plaintiff-Appellant